May 21, 2026

# In the Court of Appeals of Georgia

A26A0836. KING v. CITY OF EAST POINT et al.

HODGES, Judge.

This case arises out of the termination of an employee following the publication of statements regarding his alleged involvement in a cyber-attack on the City of East Point's email system. Deron King, the employee, sued the City of East Point, Mayor Deana Holiday-Ingraham, as an individual and in her official capacity, City Councilmember and Mayor Pro Tem Karen Rene, as an individual and in her official capacity, and seven fictitious defendants as unidentified councilmembers (collectively "the defendants"). The defendants filed a motion in the trial court to enforce a settlement agreement reached by the parties, and the trial court granted the

defendants' motion. King appeals from that order. For the reasons that follow, we affirm the trial court's decision.

This Court conducts a de novo review of the trial court's order on a motion to enforce a settlement agreement. *DeRossett Enters. v. Gen. Elec. Cap. Corp.*, 275 Ga. App. 728 (621 SE2d 755) (2005). In doing so, we view the evidence in the light most favorable to the nonmoving party. Id.

So viewed, the record shows that in September 2021, the City of East Point experienced a cyber-attack on its email system. The City Manager at the time indicated that the IT Department was investigating the cyber-attack, but chose not to inform the public about it. Thereafter, in January 2022, King was appointed as the City Manager. On August 8, 2023, Holiday-Ingraham informed the public about the 2021 cyber-attack and indicated that a private forensic auditing firm would be hired to investigate. On August 21, 2023, Fox 5 News Atlanta published an article stating that taxpayers were calling for King to resign or be terminated after the City purportedly disclosed that the "audit revealed the [C]ity lost more than $700,000 in an email scam, and … King knew about it, but didn't tell the council or taxpayers." In December 2023, King was terminated by the City.

The month after his termination, King made an initial demand for settlement to the City for its failure to comply with the terms of his employment contract. After several failed exchanges to negotiate a settlement, King served an ante litem notice on the City, and on August 15, 2024, King sued the defendants. In his complaint, King asserted that the defendants failed to comply with the terms of his employment contract, committed defamation per se, and negligently failed to "set the record straight" regarding the "false inference that [he] bore some responsibility or engaged in some dereliction of duty regarding the 2021 cyber-attack[.]"

On September 12, 2024, the defendants' counsel reached out to King's counsel to introduce themselves. The defendants' counsel subsequently emailed King's counsel on October 7, 2024, stating that they "spoke[] to the City Attorney regarding [the] prior settlement discussions, and [they] would like to discuss the same." On October 9, 2024, counsel for both parties spoke on the phone and corresponded regarding the time it would take to get the City's board to meet and finalize a press statement. On October 18, 2024, King's counsel emailed the defendants' counsel requesting particular language for the press release and reimbursement of attorney fees. The defendants' counsel responded on October 22, 2024, indicating that the

City's board "remained willing to work on the language of the statement[,]" but counsel did not believe the City would consider attorney fees. Awaiting approval from the board and amidst settlement negotiations, the defendants filed their answer on October 25, 2024.[1]

On February 21, 2025, the defendants' counsel emailed King's counsel the defendants' settlement terms:

> (1) 1 month severance in lieu of notice; (2) 3 month severance per contract; (3) cash payment for the 4% salary-increase for 2023; (4) cash in lieu of the 3 month's benefits (per contract), in exchange for a full release/dismissal of all claims; and (5) the following statement from the City:

> "The comments, views or opinions expressed by unauthorized spokespersons from the City of East Point or the news media stating that former City Manager Deron King was terminated due to a cyber-attack event does not represent the official view or opinion of the City. *Upon completion of our internal investigation, it has been found that there was no wrongdoing in connection to the cyber-attack in 2021 by any employees or Mr. King.*"

On March 5, 2025, King's counsel countered the defendants' offer by asking for $11,000 in attorney fees in addition to the defendants' provided terms and press statement. The defendants' counsel countered King's offer on March 18, 2025, with

---

[1] Multiple extensions were given to the defendants to file their answer.

$7,000 in attorney fees in addition to the defendants' provided terms and press statement.[2] The March 18, 2025 offer by the defendants was given "in exchange for full and complete resolution of the lawsuit" and included the following:

> 1. Statement with language previously agreed to among the parties
> 2. $15,416.67 (1 month severance in lieu of notice)
> 3. $46,250 (3 months severance per contract)
> 4. $7,400 (4% salary raise over 2023)
> 5. $2,400 (cash in lieu of 3 month[s'] benefits)
> 6. $7,000 attorney fees

This offer only addressed a change in the amount of attorney fees; items 1-5 never changed during negotiations, with this particular offer only specifying the monetary amounts previously agreed to in items 2-5. In response to the defendants' offer, King's counsel "counter[ed]" on March 24, 2025, "with $9,000 in attorney[] fees[,]" specifically noting that "[t]he other items are as [the defendants' counsel] stated[,]" referring to items 1-5 in the March 18, 2025 email.

---

[2] The trial court and the City refer to the March 18, 2025 email as the City's second offer.

On March 25, 2025, the defendants' counsel emailed King's counsel and asked, "Can we just meet in the middle at $8,000 on the fees (all else being the same)?"[3] The following day, on March 26, 2025, King's counsel reached out to the defendants' counsel asking for details on the press release, such as when and where it would be published, so that she could "sell this counter by giving [her] client details about the press release." The defendants' counsel responded that they believed "it would be posted wherever press releases are ordinarily posted[,]" and the timing of the posting was "contingent on whenever [they could] get the settlement finalized." King's counsel responded to the defendants' counsel that their "assumption appears to be correct." Within the same March 26, 2025 email, King's counsel responded:

> Press Releases by the City are normally released by the Mayor as well as the Public Information Officer. The placement location would be the Facebook page, the City's website, Linkedin, Twitter page, as well as the local news stations ABC, NBC, CBS, and FOX news. These stations also had reporters designated to report on this story both online as well as their morning, afternoon and evening newscasts.

> Thus, we expect nothing less. We have a deal as follows:

> 1. Statement with language previously agreed to among the parties
> 2. $15,416.67 (1 month severance in lieu of notice)

---

[3] The trial court and the defendants refer to the March 25, 2025 email as the City's third offer.

3. $46,250 (3 months severance per contract)
4. $7,400 (4% salary raise over 2023)
5. $2,400 (cash in lieu of 3 month[s'] benefits)
6. $8,000 attorney fees reimbursement

I'll wait to review the settlement agreement. When do you expect to have a draft ready?

On April 7, 2025, the defendants' counsel sent King a draft of the settlement agreement. King's counsel sent back multiple revisions to the agreement, including language regarding how the press release would be issued and providing that the defendants would release their claims against King. The defendants' counsel took issue with some of the revisions. Specifically, the defendants' counsel argued that the "additional terms regarding the release/posting of the statement were not agreed upon" or included in the March 26, 2025 email where King's counsel indicated that a deal had been reached. The defendants' counsel, however, told King that the defendants were "amenable to having the statement memorialized in writing and either transcribed into the [board] minutes or a written version appended to the minutes."

As for King's addition of a mutual release of claims, the defendants took the position that "making the release mutual" was "never bargained for[.]" Ultimately,

King agreed "to limit the release to [Mayor Ingraham's and Councilmember Rene's] official capacities *only*," and the City agreed to "release any claim it [had] against King arising out of the King Case." In a May 20, 2025 email, the defendants' counsel concluded: "I trust this will be acceptable, given the proposed agreement attached hereto goes well beyond the material terms that you agreed to[.]" That email included the language from King's counsel's March 26, 2025 email specifying the terms of the settlement agreement King had accepted.

On May 30, 2025, King's counsel again sent the defendants' counsel proposed changes to the settlement agreement. The City defendants stated that the release language was still unacceptable and that "somewhere along the line, your language about distributing the statement via Twitter, Facebook, etc. somehow got *re-included* in the draft despite that we both agreed it would be memorialized in writing and appended to the minutes (on the [April 22] telephone call and in my [April 25] email)." On June 3, 2025, the defendants' counsel informed King's counsel that if they did not hear that King was willing to execute the settlement agreement by June 9, 2025, they would be moving to enforce the agreement.

On June 9, 2025, King filed a motion to amend the scheduling order to permit time to complete discovery. The next day, on June 10, 2025, the defendants filed their motion to enforce the settlement agreement.

Following a hearing, the trial court issued a July 25, 2025 order granting the defendants' motion to enforce the settlement agreement and denying as moot King's motion to amend the scheduling order. Specifically, the court found that King "unequivocally accepted the [defendants'] third offer" via email on March 26, 2025, when King's counsel stated, "[w]e have a deal as follows[,]" and outlined the same terms included in the defendants' third offer. The court further found that (i) "the manner [in which] the statement would be issued was never a material term to the [defendants'] third offer[,]" and (ii) "the form of the final written release and settlement agreement was never a material term to the [defendants'] third offer." King appeals this order.

> Settlement agreements are subject to the same requirements of formation and enforceability as other contracts. This means that an agreement to settle a pending dispute is formed only when the minds of the parties meet at the same time, upon the same subject matter, and in the same sense. When an offer to settle has been extended, an answer to the offer will amount to an acceptance only if it is unconditional and identical with the terms of the offer. All of that said, the law favors

compromise, and when parties have entered into a definite, certain, and unambiguous agreement to settle, it should be enforced.

*Progressive Mountain Ins. Co. v. Butler*, 364 Ga. App. 439, 442(2) (875 SE2d 422) (2022) (citations and punctuation omitted). If an alleged settlement agreement is the product of the attorneys for the parties, "the proponent of the settlement must establish its existence in writing." *Johnson v. DeKalb County*, 314 Ga. App. 790, 793(1) (726 SE2d 102) (2012) (citation and punctuation omitted). To satisfy this requirement, the writing ideally consists of a formal, signed written agreement, but "letters or documents prepared by attorneys which memorialize the terms of the agreement reached will suffice." Id. (citation and punctuation omitted).

1. King argues that the trial court erred in ruling that the parties entered into an enforceable settlement agreement on March 26, 2025. Specifically, he claims that (i) the court improperly construed the defendants' March 26 email as a third offer rather than a counteroffer, and (ii) King's counsel's statement that "[w]e have a deal as follows" did not constitute unequivocal acceptance of the defendants' counteroffer. We disagree with both assertions.

Throughout the exchange of emails in the record, it is clear that the parties were attempting to reach a settlement agreement. Indeed, on March 18, 2025, the

defendants' offer included the language "in exchange for full and complete resolution of the lawsuit" and then outlined six terms. Five of these terms remained consistent; the only term that changed following this offer was the amount of attorney fees. On March 25, 2025, the defendants' counsel emailed King's counsel the following: "Can we just meet in the middle at $8,000 on the fees (*all else being the same*)?" (Emphasis added.) "All else being the same" indicated the five other terms that the parties repeatedly included in their emails: (1) a press release statement whose language was previously agreed upon; (2) one month severance in lieu of notice; (3) three months' severance per King's contract; (4) a four percent salary raise over 2023; and (5) cash in lieu of three months' benefits. In response, on March 26, 2025, King's counsel explained where press releases were "normally released" and said, "Thus, we expect nothing less. We have a deal as follows[,]" and counsel outlined the five terms that had remained consistent and $8,000 in attorney fees.

Regardless of who initiated the settlement negotiations and whether the defendants' March 25 email constituted an offer or a counteroffer, the record demonstrates that on March 26, King's counsel accepted the proposed agreement delineated in the defendants' March 25 email and, in fact, memorialized the terms of

the settlement agreement in her March 26 email. Although King now attempts to avoid the agreement by arguing that the deal he agreed to was only for "monetary terms" and press release language, not a relinquishment of his right to demand additional terms outlined in his initial demand letter, this argument fails.

First and foremost, the March 26 email from King's counsel constituted an unequivocal, unconditional acceptance of the terms previously outlined and agreed to by the parties, merely adding the final agreement as to the amount of attorney fees. The email exchange did not indicate that the settlement agreement was conditioned on any additional terms, and the record shows that no terms other than the six outlined in the March 25 and 26 emails were discussed in any of the email exchanges between the parties' counsel. It is disingenuous for King to now argue that he intended to settle only the monetary terms when his email exchanges never indicated this fact.

Moreover, the email exchange did not indicate that the settlement agreement was "conditioned upon the parties' approval of settlement documents[.]" *Cumberland Contractors v. State Bank and Trust Co.*, 327 Ga. App. 121, 128(3) (755 SE2d 511) (2014) (finding that the "drafting of documents necessary to effectuate the settlement

may have been a condition of the performance but it was not an act necessary to acceptance of the offer to settle") (citation and punctuation omitted). See also *Grange Mut. Cas. Co. v. Kay*, 264 Ga. App. 139, 142(2) (589 SE2d 711) (2003) (emphasizing that the drafting of documents necessary to effectuate a settlement agreement is not a necessary act for acceptance of the agreement). Accordingly, the fact that King's March 26 email may have contemplated a formal, drafted settlement agreement does not defeat the enforceability of the settlement terms. *Cumberland Contractors*, 327 Ga. App. at 128(3).

The trial court properly concluded that the defendants and King entered into an enforceable settlement agreement on March 26, 2025.

2. In an effort to avoid the settlement agreement, King argues that the manner or method for issuing the press release was a material term, and, therefore, an agreement was not reached because the parties did not have a meeting of the minds on this particular term.[4] We find no merit in this argument.

---

[4] Pretermitting the question of whether the form or manner of a press release is always material in a defamation retraction statement, King did not raise this issue on appeal, and we therefore do not address the issue. See *Pneumo Abex, LLC v. Long*, 357 Ga. App. 17, 29(2) (849 SE2d 746) (2020) ("[W]ithout a ruling by the trial court on a particular issue, there is nothing for this Court to review upon appeal.") (citation and punctuation omitted).

It is true that "[n]o contract exists until all essential terms have been agreed to, and the failure to agree to even one essential term means there is no agreement to be enforced." *Wright v. Nelson*, 358 Ga. App. 871, 874 (856 SE2d 421) (2021) (citation omitted). However, just because King initially demanded a specific form of retraction in January 2024 — a retraction of the press release published in the same media in which the original press release was issued — does not mean it was a material term of the subsequently agreed to March 2025 settlement agreement. In fact, in both a March 2024 email and a May 2024 demand letter, King's counsel demanded the following press release:

> The comments, views or opinions expressed by unauthorized spokespersons from the City of East Point[5] or the news media stating that former City Manager Deron King was terminated due to a cyber-attack event does not represent the official view or opinion of the City.

Contrary to King's assertion, these documents did not demand or address any specific manner or method of disseminating the press release. And the record shows that none

---

[5] The second demand letter substitutes the phrase "current and former employees of the City of East Point" in lieu of "unauthorized spokespersons from the City of East Point."

of the email exchanges leading up to the March 26 settlement agreement referenced a specific manner or method for issuing the press statement.

We note that King's counsel inquired about the press release prior to accepting the defendants' March 25, 2025 settlement terms, stating in an email: "Perhaps I can sell this counter by giving my client details about the press release. Can you tell me anything about when it will be issued? Where it will be published? Etc.?" The defendants responded: "I had assumed it would be posted wherever press releases are ordinarily posted. We've already agreed on the language, and as far as timing is concerned that is contingent on whenever we can get the settlement finalized." King's counsel then stated who King believed would release the press release as well as where it would be released, and King's counsel wrote, "we expect nothing less." In that same email, King's counsel unequivocally stated, "[w]e have a deal as follows" and listed the six terms of the deal. Particulars regarding the press release were not included in his outline of the terms.

Although King's counsel inquired about the press release details and described what King believed would occur involving the press release, his counsel's acceptance of the settlement agreement was not conditional on any particular manner or method

of the press release dissemination. See *Herring v. Dunning*, 213 Ga. App. 695, 699 (446 SE2d 199) (1994) (finding that neither a suggestion regarding the form by which the controversy should be terminated nor an inquiry inviting confirmation rendered an unequivocal and unconditional acceptance of an offer to settle a counteroffer). In fact, the terms specifically listed by King's counsel when he unequivocally and unconditionally accepted the settlement agreement on March 26, 2025, stated only: "Statement with language previously agreed to among the parties[.]" Nothing regarding the manner or method of the press release was included in the settlement terms delineated and accepted by King's counsel. As such, King's counsel's statements merely constituted precatory words. "Precatory words are words whose ordinary significance imports entreaty, recommendation, or expectation rather than any mandatory direction." Id. (citation and punctuation omitted); see also *Pourreza v. Teel Appraisals & Advisory*, 273 Ga. App. 880, 883 (616 SE2d 108) (2005). "[S]uch language does not render a purported acceptance a counteroffer." *Torres v. Elkin*, 317 Ga. App. 135, 141(2) (730 SE2d 518) (2012).

We agree with the trial court that the manner or method in which the press release would be issued was not a material term to the defendants' March 25, 2025

settlement agreement proposal and King's counsel's March 26, 2025 acceptance of the proposal.

3. King next argues that the trial court erred in ruling that the type or form of the final written release to be executed — whether it was mutual or unilateral and whether it included individual defendants — was not a material term that voided the settlement agreement based on a lack of a meeting of the minds. As more fully explained below, these additional terms were suggested by King after March 26, 2025. It is true that "a purported acceptance of a plaintiff's settlement offer which imposes conditions or attempts to release parties other than the named defendant-offeree will be construed as a counter-offer to the offer to settle for the policy limits." *Bennett v. Novas*, 364 Ga. App. 364, 367(a) (874 SE2d 871) (2022) (citation, punctuation, and emphasis omitted). What King fails to recognize, as we now conclude in Division 1, is that an enforceable agreement was reached on March 26, 2025, before King began imposing additional terms regarding the type or form of the release. "[S]ince the agreement to terminate the controversy already had been created, the defendant's subsequent proffer of a release form which plaintiff believed was not in compliance with the understanding of the parties would not be a rejection of the previously

17

accepted offer." *Herring*, 213 Ga. App. at 699 (citations omitted). We therefore disagree with King's argument that the type or form of the final written release was a material term.

With respect to this argument, King relies on his redlined versions of the settlement agreement. After King received the written settlement agreement from the defendants, he sent an April 17, 2025 redlined version back to the defendants with significant changes, including the addition of a mutual rather than unilateral release and a release by the individual defendants. The defendants immediately sent an email objecting to the mutual release language. The defendants repeatedly stated that a mutual release was not bargained for during the settlement negotiations and that the City had no authority to negotiate a release of personal claims by the individual defendants. While the City ultimately agreed to release any claims it had against King arising out of the King case, the defendants specifically noted that "the proposed agreement attached hereto goes well beyond the material terms that you agreed to below, which I'm copying here and highlighting for your convenience[,]" and the defendants highlighted the six terms which King's counsel agreed to on March 26,

18

2025. King claims that the defendants' objections to the mutual release demonstrate that the form of the release was material.[6] This claim lacks merit.

As stated in Division 1, the parties reached a binding settlement agreement on March 26, 2025, when King's counsel responded: "We have a deal as follows[,]" and outlined the five terms that had remained consistent and $8,000 in attorney fees. There is nothing in the parties' email exchanges or the record to indicate that the settlement was conditioned on a written agreement. See *Pourreza*, 273 Ga. App. at 883 ("[T]he drafting of documents necessary to effectuate the settlement may have been a condition of the performance but it was not an act necessary to acceptance of the offer to settle.") (citation and punctuation omitted). Nor is there anything in the parties' email exchanges or the record to suggest that the parties contemplated a release by the City or other defendants prior to the March 26, 2025 binding settlement agreement. Additionally, there is nothing in the record to suggest that the parties contemplated a release of personal claims by Holiday-Ingraham, Rene, or any other unidentified councilmembers against King. Discussion regarding these issues ensued

---

[6] In his appellate brief, King states that "the [defendants' c]ounsel specifically referred to the type of release as a 'material term' he believed King's [c]ounsel was adding." The actual statement by the defendants' attorney was as follows: "Set aside that you are once again adding material terms that were not agreed to."

only after the defendants' counsel sent King's counsel a written settlement agreement on April 7, 2025, and King's counsel began to redline the document.

If King's intention was to obtain a mutual release and a release of personal claims by the individual defendants, then he should have bargained for those terms prior to entering into the March 26, 2025 settlement agreement. King's redlined agreement and the subsequent email exchanges between the parties regarding the form of the release after an agreement was reached does not alter that fact that King failed to include these terms prior to the March 26, 2025 binding settlement agreement. Although the defendants' counsel engaged in discussion over these additional terms with King's counsel via email and through review of the redlined settlement agreement drafts, these subsequent communications do not negate the fact that an agreement had already been reached between the parties, and King "has cited no case in support of [his] argument that we should look to a party's subsequent conduct in determining whether it entered into a valid [settlement agreement]." *DeRossett Enters.,* 275 Ga. App. at 730(1).

Persuasive authority with mirroring facts support our conclusion. A similar issue was addressed in *Owners Ins. Co. v. Great Am. Lawn, LLC*, No. 1:23-CV-2461-

TWT, 2024 WL 1159256, at *3-4(III)(A) (N.D. Ga. Mar. 18, 2024).[7] In that case, the court held that conversations between counsel involving requests for a limited liability release should not be considered because these conversations occurred after the parties agreed to a settlement, and no cases were cited "in support of its argument that [the court] should look to a party's subsequent conduct[.]" Id. at *3-4(III)(A) (citing *DeRossett*, 275 Ga. App. at 730(1)). We find this reasoning persuasive.

Accordingly, we agree with the trial court that the type or form of the release was not a material term to the defendants' March 25, 2025 settlement agreement proposal and King's counsel's March 26, 2025 acceptance of that proposal.

*Judgment affirmed. Barnes, P. J., and Markle, J., concur.*

---

[7] "Decisions of federal courts are not binding authority on this court, but their reasoning may be persuasive." *Tolson v. Sistrunk*, 332 Ga. App. 324, 331(1) n.3 (772 SE2d 416) (2015) (citation and punctuation omitted); see also *Occidental Fire and Cas. of N.C. v. Goodman*, 339 Ga. App. 427, 433(6) (793 SE2d 606) (2016) ("[W]hile we are not bound by federal authority, we find persuasive the decision of a federal court which analyzed this issue[.]").